All rise. Illinois Color Court Book Division is now in session. The Honorable Justice Nathaniel Alciconia is presiding. Good morning. Please be seated. Call the first case. 15-0365, Alciconia Ellis v. City of Chicago. When the attorneys are going to address the court this morning, please approach the podium, state your name, and the party you represent. Good morning, Your Honor. My name is James A. Smith, and I represent Alciconia Ellis, special administrator of the estate of her late deceased father, Kenneth Walker. Good morning, Your Honor. Carl Newman on behalf of the City of Chicago. Good morning. We were allotted 30 minutes for this case. We can be flexible with the time. There's only one case on the docket this morning, though. The time will be divided equally. The appellant can reserve some time for rebuttal if they so choose. I will reserve five minutes for rebuttal. Thank you, Your Honor. I will. With that, you may proceed. Thank you, Your Honor. Just to clarify a point, Your Honor, when you say 30 minutes, do you mean 30 minutes total or 30 minutes total? Total. 30 minutes. I'm sorry. 30 minutes total. So 15 minutes for each side, and you can reserve. Thank you, Your Honor. Okay. May it please the Court. My name is James A. Smith. I represent plaintiff appellant Alciconia Ellis, special administrator of the estate of her late father, Kenneth Walker. Mr. Walker, age 28, was killed in a single vehicle accident which took place shortly after 2 a.m. on April 1st, 2007. At that time, an eastbound SUV driven by one Raphael Newman entered an underpass just west of the intersection of 95th and Dorchester Avenue in Chicago, Illinois. It swerved left to avoid a large pool of water in the right-hand lane, spun out of control, and struck a light pole just past the underpass. Ellis brought a wrongful death and survival action in the circuit of Cotico County against defendant Ant Lee, city of Chicago, and Raphael Newman, who is not a party to this appeal. In substance, Ellis claimed the city had failed to properly maintain the underpass, allowing undrained water to cool, which, when combined with excessive speed on the part of the driver, caused the accident. The city is alleging that there is no standard presented here for when the city has a duty to come in and remove a defect in a roadway, not a defect, but an obstacle or a puddle. In addition to that, they clean them every other spring, and the last time that they were cleaned was in May of 2005. There was no regular cleaning. Is there anything in the record that indicates the cause for this pooling of water in this particular instance? In this particular instance, Your Honor, we do not know the exact cause. We know that it had to, in some measure, be related to the blockage of the drains. And we know that from the fact that two hours after the occurrence, when the investigator was measuring it, there was the pool still sitting there undrained. There had been prior instances where people called for water in the viaducts, the city would show up, and there was no water. But clearly, in this particular case, the drains were blocked. Going back to your statement about every spring the city cleans them, I thought Mr. Kilroy testified that they try to do them in the spring, but they don't get to every one every spring. Yes, that is true. I regard that as an admission. What the records show is that the last systematic cleaning of the drains in this area was done in May of 2005. There were nine separate catch basins and drains cleaned. Anything that was done after that was done on an ad hoc basis in response to phone calls. But speaking of standards and how cases sometimes create their own standards and facts create their own standards, if you look at the facts submitted by the city, what they do show is that on November 2, 2006, there was an accident, which was for all facts a prequel of this accident, in which a vehicle went into the viaduct, lost control on water and ice, and swerved into the west-hand lane, causing bodily injury. Then on November 14, 12 days later, there is more water in the viaduct. On November 20, 7 days later, 8 days later, there is more water in the viaduct. On November 29, there is more water in the viaduct. And then on February 4, 2007, there is more water in the viaduct. There is, in other words, a series, starting with November 2, 2006, and through February 4, 2007, of five water-in-viaduct incidents, which is more than one a month, the highest set rate of incidents shown in all of the city records for a similar form of period, going back to 2002. Okay, but were those all under the viaduct? They were all under the viaduct. Are you sure about that? The SRA 2007 was the water main leak, right? Onto the road, and the salt truck was gone. You know, if you look at the SR, you can't, what they say is possible water leak, and the SR doesn't bear it out. What the SR says, essentially, is there's just water in the viaduct. And they don't say established water leak. In the viaduct. Yes. In the viaduct. Because, as I read what Mr. Kilroy was saying, there's manholes, there's drains, sewers, whatever phrase we want to use, all up and down that road, which makes sense. Yes. It's not necessarily just in the viaduct. And I thought that Mr. Kilroy said the February, and I'm not talking about any of the other ones right now, but the February one, I remember him talking about the fact that water seemed to have kind of come up from the water main. And he didn't think that that had anything to do with the viaduct, or was not around the viaduct. How do we know that was the viaduct? Well, the material that the city provided to us was provided pursuant to a request for production that specifically asked for any and all city records of maintenance and repair dealing with this specific area. So we are working with what the city gives us in terms of their understanding of this underpass and what is relevant to this underpass. That doesn't mean that that report was talking about this underpass. I mean, Kilroy said he didn't think this had anything to do with the viaduct. He said a lot of these reports aren't about the viaduct. And if you look at the addresses on the report, some of them, I mean, I don't know what the exact address is of the viaduct, exactly how far east on 95th Street it is, or west. But they're different. The reports have different addresses. I mean, some of these are talking about other places on 95th Street nearby, which I'm not sure that has any real relevance to you whatsoever. Well, first of all, what we can establish from the very police report which describes this accident, we know that the 1400-1401 area is the immediate area of the viaduct. And we know that the viaduct is served by more than one particular catch basin. There is a series of catch basins and drains in that viaduct area. So, again, when the city is telling us that these are the specific areas, these are what we have for this specific area, we have to work with that too. Is the police report of the November 2nd accident in the record? Yes, it is, Your Honor. Do you happen to know where it is? It's okay if you don't. No, I can give you the citation if you just give me a second. Counsel, I'll find it. November 2nd. No. C-0-3-0-6-4. Excuse me. C-0-3-1-1-9-20. No, that's the November 2nd accident. The way they were produced was the SRs were produced first and then the police reports. So there's a little bit of space between them. Okay. The circuit court, in its order of July 30th, 2014, granted the city's motion for summary judgment, which the city made after discovery in the case was closed and the case had been set for trial, on two of the multiple grounds raised. First, that the accumulation was natural rather than unnatural, and second, that Ellis had failed to produce evidence of a breach by the city of any duty that it owed to Walker. Ellis thereafter, settling her claim as Newman, filed a motion for reconsideration, which the circuit court denied in an order dated January 5th, 2015, but in that order withdrew the natural versus unnatural basis for the earlier motion for summary judgment, leaving only the absence of evidence of a breach by the city of its duty as the sole remaining basis for its grant of summary judgment. On appeal, the city also argues that the ponded water was an open and obvious hazard, which was a contention the trial court had rejected in the city's earlier motion for summary judgment. So the issues that you face are two. First, whether the circuit court erred in granting summary judgment to the city on the basis that Ellis produced no evidence establishing that the city had breached its duty to maintain the railway, and second, whether the city owed no duty of care because the danger presented by the ponded water was open and obvious. I'm sorry, counsel. I'm sorry. The open and obvious issue was not what was rejected by the court. That is correct. So there is much in the briefs or in your briefs with respect to the circuit court's suggestion or directive that you present an expert. That's correct. What's your position on that? I know you cite an earlier case for the proposition that when the circuit court had ordered an expert in a particular case involving the width of a roadway, that this court found that to be error. The short answer to that contention is that not every case requires an expert. This is not a professional liability case. This is not a product liability case. It is a premise liability case in which arguably the jury is not beyond the candidate jury to understand notions such as you have a screen cleaning of property after a Chicago winter, and when you see an uptick of incidents, you should be concerned. Those are not beyond the candidate of a jury to understand. And basically, you really don't need an expert for this case. You need Excel. You need to be able to plot the incidents that happen and understand and analyze what the reports are that the city is giving you rather than having an expert spoon feed that information and try to establish a standard of care. The fact is it's a premises maintenance case, and premises maintenance cases are decided by juries every day. The point here being when the city saw that there was this uptick, and there is an uptick, after everything is done, you still have a pattern running from November through February of incidents that are unprecedented in this particular record. And our contention is either at that point in time, some alarm bell should have been ringing for this particular viaduct. Someone should have gone out there and seen it. Or, in the alternative, the city should have moved up its general cleaning program, which it had done previously. When it had done general cleaning programs, the first one was in January of 2003, and that covered five of the viaducts in the question. Then they did one in May. They didn't start one here until April 27th, which is 27 days after the date of this particular occurrence, and that's the tragedy of this case. The fact is that there was a prequel of this occurrence. There were things that would have led a reasonable person in the shoes of the city to ask questions about what was going on at this viaduct, and instead it was a sleep at the switch. That's the essence of the plaintiff's position in this case. Didn't Mr. Kilroy say that of the various reasons that you could have flooding, that the most common reason was the accumulation of garbage or other debris over the drain cover at the street level? There were a variety of reasons that he testified to. But didn't he say that was the most common reason? He said that was a common reason, as I recall. He also testified that you could have it because of dirt runoff into the drain. Right, he listed several reasons. He listed a lot. He said the most common one was something just covering the drain cover, so you could just lift the lid off or just rake across and the water would start flowing through. Right. Okay, and that exact thing had happened at least a couple of times under this viaduct over these last few years leading up to the accident, right? There had been several such incidents, unquestionably. Right. The point being, how often were they happening? If you look through the records, I mean, you see a periodic series of incidents and then this one at the end. Excuse me. It's one thing to talk about things that build up over time and that repeatedly build up over time. If you were to say dirt keeps building up over a three-month period in the outlet pipe. I'm throwing out terms I've been reading all about. I'm not sure what the difference is between these things. But an outlet pipe or the water main seems to back up every three months or every three to four months the catch basin seems to fill and we have to pump it. There are some things that can build up over time and we might be able to say, gee, the city should have figured out, hey, this is a pattern. It's another thing if someone is just throwing something into the sewer and clogging it up. That could happen at any time. Now, if we were to hold the city responsible for that, we're basically holding them to a duty to constantly inspect and monitor every viaduct to make sure nobody throws something in it to jam it up, aren't we? I don't think that that is necessarily the case. And the reason I think it's necessarily the case is that I have to believe it's a little bit easier to block or cause a viaduct of this character to be jammed by throwing something in it when it's already stuffed with the accumulation of runoff and dirt and all the other things that periodically flow through there than it is when you've cleaned it recently and it's still basically reflowing. What he was talking about was garbage on top, on the top, so it never gets to any of the drains. The drains could be pristine. They could have been cleaned an hour earlier. But if there's something thrown on top of it that's garbage that keeps the water from ever getting there, that will clog up without the water ever reaching it. Well, what we know from the police report, there is no indication that there was anything sitting anywhere that met that description. There's no indication of anything, period, right? I mean, you can't sit here and say the catch basin clogged up that day and that's why the flooding happened. You can't say the sewer main backed up. It could be something that built up over time. It could be something that happened that day when someone threw off a piece of clothing and it blocked the drain. It could be any of those things, right? Some of which you might attribute to the city and some of which you couldn't possibly hold the city responsible for. Well, that's why I think the question in this case, what you're asking essentially is a question of proximate causation. Do you think that there's evidence of proximate causation? And that's certainly a reasonable argument for the city to make in front of a jury. How does that square with, so a few days after this horrible accident occurred, there is apparently a cleaning and the report, as I understand it, doesn't reveal how it was cleaned or what was cleaned out. So how do we know that it wasn't clothing, that it wasn't just some other kinds of garbage that might have gotten trapped over this drain precluding the water to properly drain into the basin? I don't know how any jury would know. Well, I think it's kind of Holmes' dog that didn't bark at that point, isn't it? Because when we've had other reports where, for example, there's something sitting on top of the drain cover, the report says, raise the drain cover, and that abated the flooding. But that's not what the report says. So that could lead to a reasonable inference that it wasn't some kind of debris, that it was in fact the systemic buildup of the dirt and grime that generally goes into these drain traps and periodically does cause them to flood. We know that this happened because we have, obviously, not only the reports themselves, we have the testimony of the witnesses to the effect that they knew about this particular area. They knew of its propensity to flood. When I went to the trial lab, they said, don't ever expect to have a witness with a Ph.D. sitting around watching something that's about to happen. Well, in this case, I have to settle for two master's degrees because we now have a witness who witnessed the accident but who was familiar with the neighborhood and what she said was every time it rains a good rain, that we have a little drizzle here, this particular viaduct has water on each side. The regrettable thing being, obviously, that Raphael Newman, who was the driver here, was not familiar with the intersection. His testimony was that he had traveled it less than ten times. That's in his deposition. So, unfortunately, he wasn't expecting this particular situation, which people familiar with the neighborhood knew about. And if the city has maintained and operated this area for 12 years, which is, in fact, the evidence of the agreement between the city and the State of Illinois Department of Transportation, then I think they certainly know what a reasonable person in the neighborhood knows. They know of this particular propensity. Indeed, even the trial court recognized the propensity. And the problem is, how much of a propensity is the propensity? And when you look at those last several months, you realize it's getting to be a lot more of a propensity. And the issue, remember... How often do you suggest the city should inspect this particular viaduct after every rain? No, I would certainly not. And I don't want to be thought of as holding the trial court is getting to. What was the particular breach at this date? There was a rain a few hours earlier. How often is the burden on the city to inspect this viaduct? I think the burden is on the city to inspect the viaduct when it sees something out of the usual happening. And that clearly was going on here. And that's the same reason I reject the notion that we have to inspect every viaduct. There was something wrong with this particular viaduct. We can see it in the November 2nd accident. We can see it in the sequence coming out of November 2nd. Something's going on. Some alarm bell is ringing. And you can't ignore your own data. Now, I'm not saying that... Council, are there any reports, and I apologize for not knowing the answer to this, but so there's a report that the city gets a call in February of 2007. What, if anything, are there any reports that indicate that there's any activity around this viaduct between February 4th and the April 25th inspection? Is there anything in there that would support that the city should have known that there is some unnatural accumulation or a problem with this viaduct? Is there a report about anything in that interim period? I believe that there is no SR report between February 4th and April 2nd. Now, obviously, or April 1st, which is the date of the accident. Actually, April 1st isn't an SR report. It's a police report. The next SR report after February 4th, I believe, is April 27th. Now, obviously, to some degree, one is speculating on what necessarily that means. Did it mean that it was a light spring for rain? It could mean that. But what we don't have is anything that particularly points to any activity on the part of the city or any other circumstance. So there's nothing that would indicate to the city that there is a problem, at least in this time period. So I think I'm getting back to Justice House's question. What is it? What's reasonable to expect that the city would do? I think the short answer to that is the problem has already manifested itself. If you have a problem between November and February, it's not going to vanish. It's not going to go away. Those drains are not going to stop accumulating. It's only going to get worse. The first lawyer who employed me said, legal problems are like wine. They never get any better. They just get worse in the bottle. And this is an example of a factual problem. It's never going to get any better. It's just going to get worse. But nothing happened. Some people got lucky between February and April. Unfortunately, Kenneth Walker was not one of them. I'll just give – I imagine that – Let me save some time. Okay. I just want to give one sentence to the open and obvious argument, which is all I believe it deserves. It's 2 in the morning in a non-residential area. You're not going to see very much that is open and obvious about anything. And I believe the testimony of Newman is that he did have some visual issues approaching this. It came up on him quickly. It's not only a function of the speed he was going at, but a function of the fact that, hey, it's 2 in the morning and it's dark. It's a dark, rainy, stormy night. So I think that issue is really not one that the city should be allowed to prevail on. Now, this is summary judgment, and the fact is – the issue before you is whether this case should have been allowed to go to a jury. And while people can present alternative theories of what happened here, in this particular case, the judge made his own judgment about what the cause of the accident was. He said it was a design defect. He made his own judgment in the shoes of the jury that you can't see. And I'm using his words in the transcript. Just a couple of reports over five years. There's a lot more than that. A lot more. Whatever you may say about the specific locations, there's a lot more than just a couple of reports over five years. And the jury should have seen that evidence and been allowed to make its own decision about it. Thank you. All right. Thank you. Mr. Nolan. May it please the Court. The judgment of the Circuit Court should be affirmed for either of two independent grounds, and I plan to address them both in turn. The first, that Ellis has failed to come forward with some evidence to create a genuine issue of material fact on the element of breach. And the second, that the pool of water covering one lane of a four-lane road presented an open and obvious hazard as a matter of law. I first want to address this question about the service records, which are essentially the only evidence in the case about the history of this underpass. Now, to my counting, as we go through in some detail in the brief, there are actually only ten instances that are really about this underpass. Four of those are scheduled cleanings that the city undertook on its own initiative. Six of those are standing water. One of those six is specifically noted to be in the westbound lanes, and we're talking about the eastbound lanes. And of the five remaining instances, there are two where there is merely objects on top of the drain cover, one that's a problem in the main sewer, one that is a problem with the water main, and only one in June of 2006, which is debris built up in the catch basin. Now, I heard this morning there's some sort of pattern to be found in these records, but our position is that there is no pattern to be inferred. It's an unpredictable series of events. And because there are these multiple different ways in which a blockage can develop, when you clean the catch basin, that doesn't prevent garbage from blocking the drain cover a week later. When you clean the main sewer, it doesn't prevent anything else. Plaintiff points out that there was a half-inch rain earlier that evening. This viaduct has a history of flooding, and the city should have known that that particular viaduct was prone to flooding under those circumstances. So there's a couple of points in response to that. Now, the first is that sometimes they're saying the hazard is the pool of water, and sometimes they're saying the hazard is the propensity of this underpass to flood. But to go back to a question I believe I heard earlier, what I was getting at was that when you look at these records, it's probably not clear on this record that this underpass floods any more often than any other underpass. In fact, one of the things to note is that there's another railroad underpass on 95th Street, one quarter of a mile to the east. I don't know. On this record, if the record doesn't show whether this one that we're talking about floods any more than one quarter of a mile away, we think that... If they both flooded, wouldn't it be some burden to check it out if there's a half-inch rain? We don't think so, Your Honor, because we're talking about an underpass where we have records of about once a year there's standing water there, and we don't know when it's going to be. So to go to the question that I heard asked before, that we don't have a duty to go out there after every time it rains, and, in fact, Ellis is disclaiming that we have that duty. And so we think that's the end of that matter. What do you make of this discussion about these November reports? Well, sir, I will direct the courts to footnote 5 on page 6 of our brief. There's a recounting of this series of service records from November 2006. Now, our position is that if you take a close look at those records, you'll discover that it's not 10 different calls. One of the many problems with these records is that they're made by people who aren't actually doing the work. They're not made by the Water Department employees who are going out when there's a call. I'll also note that this description of this as being six incidents in November 2006, I don't recall seeing that timeline in any of the briefs that Ellis has filed in this case. So our position is that there was an accident in November and a call at some point in November that we went out and repaired. There's no evidence to suggest that there was some ongoing pool of water under this underpass for three months or six months, so I don't exactly know what the evidentiary support for that would be. One moment. Oh, yes, and also to get to this accident that's on ice in November 2006, there's no evidence in the record that suggests that there's any relationship between that accident and the water main leak in February 2007 or the accident at issue in this case.  So, yes, the custom that Ellis has contended in the opening briefing again today is that there's a custom to clean the drains every spring. And so first I'll note that the evidentiary basis for that is that when there aren't calls about a particular underpass, that we try to go out and clean them once every spring. So first, even if that does establish a custom, it doesn't on its own terms apply to this underpass, because there were calls, so it's not just one they go out to if they haven't been out there in a while. Second, that we, in fact, did go out and clean it that spring. We cleaned it April 25th, which by any reasonable definition is still within spring, so it's not clear the custom was breached. And third, as we cite in our brief, cases to the effect that a self-imposed custom like this, breach of that custom alone is not sufficient to establish breach for a negligence cause of action. And just to get to this last point, that the issue of the breach of custom assumes that the problem in this case was that the catch basin was clogged with debris, which we actually have no way of knowing that on this record. The real problem in Ellis' case is that she doesn't know what caused this pool of water to form, and she's not entitled to assume that it must have been a breach of the city's duty to exercise ordinary care. Well, on April 25th, 24 days after the accident, the city performed a cleaning. They call it a routine cleaning. It might have had something to do with the fact there had been a fatal car accident three weeks earlier. Maybe not. And the catch basin was cleaned up. Yes. Why does a jury look at that and say, well, that shows that at least three weeks later, the catch basin was in need of cleaning. Maybe we could infer that three weeks earlier it also was, and that's why there was a flood. It's actually not clear that the catch basin needed cleaning on that day. It's just the record shows that they went out there for a catch basin cleaning program. So, for instance, the earliest we have in this case is a report from January 2003, a catch basin cleaning as part of the catch basin cleaning program, where they specifically note that only a quarter of a yard of dirt was removed in the process, which actually suggests that it wasn't in a condition that it was blocked. So we don't think that a jury could infer backwards from that really sparse record. It doesn't say what, if any, problem was found or what, if anything, was done about it. Counsel, I just need you to go back. Earlier in your argument, you indicated that there are two different individuals or entities. Someone goes out to do the inspection and the cleaning, but then someone else actually makes the report? Yes, Your Honor. I'm not certain how there is any accountability with respect to what the individuals who go out and actually see, visualize what's going on on the scene and then report back to someone else who's actually pinning the report. I mean, how reliable is any of that? As we note in our brief, we're conceding that these records are somewhat problematic and sparse and contain a certain amount of almost apparent inaccuracies. The system of having water department employees go out and actually do the work and having somebody else prepare the CSRs, this is the system that we've chosen. It's imperfect, obviously, but to the extent that there's any, you know, if the records just don't tell us that much, then we think that just means Ellis can't prove her case. I just want to make one... Counsel, what is someone supposed to do if there's a car accident like this and you've got flooding and there's not supposed to be flooding, right? It's not supposed to be flooding. Okay, and so that night, of course, there's an accident, there's a death, there's an arrest made, there's all sorts of chaos going on. Who knows how much later anybody is even thinking about filing a lawsuit. By the time an attorney can come in to try to make sense of all this, we're long past April 1st, 2007. What is a plaintiff supposed to do in that circumstance? They could look at the reports, but if the reports weren't done well enough, as you've admitted, and it's not easy to read these reports. I've had an easier time reading the Internal Revenue Service regulations, but even if they are easy to read, who knows if they're exactly true. Even Kilroy said, I'm not sure what this means, I'm not sure what that meant, I'm not sure that's even right. What is a plaintiff supposed to do in that situation to prove it? They do have some, I wouldn't say res ipsa, but there is some evidence that something is wrong here. There's not supposed to be flooded water, and there is. So what does the law say in that situation? The plaintiff really has difficulty figuring out which of the things caused it, whether it was a negligent cause or a non-negligent cause. Well, so our first response would be that our position is that the plaintiff must come forward with some evidence to prove the elements of their claim, and if they are unable to do that, then that's to their detriment and not ours. There are a lot of things in this record, though, that are missing. There's a lot of question marks, and so I actually think it's entirely possible that they could have done a more thorough discovery, but the discovery is long since closed, and now this accident is nine years ago. So I don't think we're going to find any new evidence about what caused this pool of water. The last point that I wanted to make was just sort of one of the ways to think about this case is to ask, you know, if they don't know what caused this pool of water, and all they have is these records that suggest that there's not a predictable pattern and a variety of different causes, some of which could arguably be a breach of the city's duty and some of which could not be, then the question would be, the one way to think of the case is to say if Ellis took this case to a jury, she would say the city breached its duty and that it failed to blank. Until she can fill in that blank, our position is she is just trying to pass summary judgment on speculation alone. I'm going to turn now just for a moment to the open and obvious argument, and what I really want to highlight is this, that the reason the circuit court gave, which is the reason that Ellis gave below for why this pool of water, some 56 feet by 17 feet, was not an open and obvious hazard, the reasons are not a way of defeating open and obvious as a matter of law. The first, that it's nighttime when everyone says that this pool was visible. The second, that the roads are wet, which doesn't seem to me like it would make it any harder to tell the difference between wet pavement and a pool of water. And the third, and this is the one that's most crucial, the circuit court ultimately rejected this by accepting the argument that even if you could see the water, you couldn't tell how deep it is. And as we argue in our brief, when you look at the water cases in open and obvious, the characteristic of water that makes it sort of the paradigm open and obvious hazard is that you can't tell how deep the water is. If you're jumping in it to go swimming, yeah. Absolutely. But you can drive over a puddle of water without endangering the car, right? Yes, but you must proceed at your own caution. And so the distinction that Ellis offers in the reply is the distinction between driving into water and diving into water, which I first note they cite no case law to support that distinction. But the question in open and obvious is about the risks inherent in the condition and not the activity around the condition. So, for instance, the water cases don't say the dangers of diving. They actually say the dangers of water. We're looking at, say, a different example, which is salami, which is a trampoline case. They say we're looking at the risks that are inherent in a trampoline, not the risks inherent in jumping. And so we think that if the problem with water is that you can't tell how deep it is, then you can't tell how deep it is when you're driving. You can't tell how deep it is when you're stepping into it. So you can choose not to jump into a body of water. If you're driving eastbound on 95th Street and you've got a car behind you in the middle of the night on a slick road, once you come upon the puddle, that's more than a puddle, the pool of water, what are you supposed to do, slam on the brakes? Do a U-turn? Risk the car behind you? What do we ask of this driver who is encountering this open and obvious condition? Well, first we ask him to slow down. I mean, he's driving 52 in a 30, and we think that under cases like Sandoval v. City of Chicago, when we ask the question whether the hazard presents an open and obvious risk as a matter of law, we're imagining an objectively reasonable person in this place and not this driver who's in fact doing 52 in a 30. And so what the driver behind him did is just drive slower before he gets to the pool of water. We know from the black box on this car that he actually didn't hit the brakes at any time before he hit the water. If he had exercised the ordinary perception and judgment of a reasonable person in his position and been driving slower, this accident would not have occurred. Unless there are further questions, for these reasons, we'll ask that the judgment be affirmed. Thank you. Mr. Smith, you have a few minutes. To be honest, as I was listening to the argument just concluded, I couldn't help but think to myself, what a wonderful, smart, self-insulating system. We make the records badly. We don't know what they mean necessarily. We have different people compiling them from the ones who are analyzing them or trying to understand them. And then we know that nobody can do anything with them. But because in the chaos and confusion of an accident, they're not going to be looking at these factors. They're going to be looking at other things. And therefore, we're completely protected, aren't we? Because nobody can prove a thing. It's wrong. It's wrong. That roadway, whatever the cause, we know that roadway was not in safe condition for reasonable use by intended users. Raphael Newman may have been going fast, and that's why we sued him. But he was an intended user of that roadway. And the reason that he had this accident is not necessarily because he slowed down, but because he was in the right-hand lane, the lane that was most flooded, the lane which was, in the words of the investigating officer, completely covered with water, as opposed to Angela Bensman, 30 feet behind and kitty-corner to him, who knew to be kitty-corner. And why did she know to be kitty-corner? Because she understood the propensity of this area, this particular viaduct, to flood. So what are we saying? That only people who know about the underpasses are entitled to use 95th and Dorchester? That's really where the city's argument comes out. I want to address something that you spoke of, Justice Cox. And there's nothing between February 4th and the day of the occurrence. There's nothing really between November and February 4th. What there is is winter. And there's a reasonable inference here that when the water wasn't sitting there, it was frozen. And you had different consequences in terms of the drainage. But what we do see at the end of the day, when all is considered and all of the bad record-keeping is taken into account, is something is happening. Something is going on. Not in every drain, not in every viaduct. Who cares? We're only focused on this particular viaduct, which caused this particular accident. And we know, because we've already had our one bite, have we not, on November 2nd, of the potentially lethal or injurious consequences of leaving this water standing here? That's what makes this situation different. We know this can kill. I don't know that that's true of every viaduct in the city of Chicago. And frankly, to be honest with you, I'm not sure I care. This one has demonstrated its potential. And it seems to be acting up. And that's what the jury had the right to look at here. As for these other issues, they are approximate cause issues. They are multiple cause issues. The city moved for judgment. The plaintiff moved for judgment on approximate cause. And, in fact, the city argued there was multiple causation, and they won on that. So we have multiple causes that contribute to this accident. But surely the water was one of them. The police officer says so. And we're entitled to look at that and say something was going on here. At the end of the day, knowledge is finite. You understand that. Knowledge is finite. We will never know everything that we would like to know. But we know enough to give rise to reasonable inferences. That's where the plaintiff is at. As for the open and obvious point, what the photos demonstrate to me is that you're approaching, as a driver, a grade with the pool going down and the pool of water coming up. And it really wasn't the pool that caused the hazard in this case. It was his attempt to avoid it. And as the circuit courts pointed out, he did everything a reasonable person would do, except that he was starting from the wrong lane, the lane that was full of water from the clogged drains. That's all I've got to say. Thank you. Thank you very much. All right. All right. This case was well-argued and well-briefed. It will be taken under advisement, and we'll issue a decision in due course. Thank you very much.